# 03 ~ 12213 EFH

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PEIERLS FOUNDATION INC. and
E. JEFFREY PEIERLS, individually and as trustee for Under Deed Ethel F. Peierls for
Brian E. Peierls, Under Deed Ethel F. Peierls for E. Jeffrey Peierls, Under Deed Edgar
S. Peierls for Ethel F. Peierls et al., Under Deed Jennie N. Peierls for Brian E. Peierls,
Under Deed Jennie N. Peierls for E. Jeffrey Peierls, Under Will Jennie N. Peierls for
Brian E. Peierls, and Under Will Jennie N. Peierls for E. Jeffrey Peierls

      Plaintiffs,

v.                                    MAGISTRATE JUDGE‾‾‾‾‾‾

JAMES E. RURKA,
MARK SKALETSKY,
PAUL J. MELLETT,
RICHARD ALDRICH,                                    Civil Action No.‾‾‾‾‾
KATE BINGHAM,
CHARLES W. NEWHALL III,
DAVID SCHNELL,
JOHN P. WALKER,

      Defendants.

---

### COMPLAINT AND JURY DEMAND

Plaintiffs Peierls Foundation Inc. and E. Jeffrey Peierls, individually and as

trustee for Under Deed Ethel F. Peierls for Brian E. Peierls, Under Deed Ethel F. Peierls

for E. Jeffrey Peierls, Under Deed Edgar S. Peierls for Ethel F. Peierls et al., Under

Deed Jennie N. Peierls for Brian E. Peierls, Under Deed Jennie N. Peierls for E. Jeffrey

Peierls, Under Will Jennie N. Peierls for Brian E. Peierls, and Under Will Jennie N.

Peierls for E. Jeffrey Peierls, state and allege as follows:

## I.   INTRODUCTION

1.    Plaintiffs bought stock in Essential Therapeutics, Inc. ("Essential"). Essential represented itself as a biopharmaceutical company committed to the discovery, development, and commercialization of critical products for life threatening diseases in hematology, oncology, and infectious disease.  Before buying Essential stock, Plaintiff E. Jeffrey Peierls ("Jeff Peierls") researched Essential.   At the time, Essential stock was traded on Nasdaq.  As part of his research, Jeff Peierls read statements that Essential filed with the SEC.  Defendants signed the statements as directors or officers of Essential.  The statements included representations that Essential had received a $60 million private equity funding.  Jeff Peierls decided to buy Essential stock for himself, a foundation, and several family trusts.  Jeff Peierls considered the equity funding to be critical to his decision.

2.    After Jeff Peierls and his family invested approximately $905,000 in Essential stock, Essential disclosed that Nasdaq determined that Essential failed Nasdaq's listing requirements and thus had to be delisted.  Essential failed the listing requirements because the $60 million infusion was not equity for Nasdaq listing purposes.  Soon after the delisting announcement, Essential filed for bankruptcy protection.  The Essential stock that Jeff Peierls and his family bought is now worthless.

3.    Jeff Peierls would not have decided to invest in Essential if Defendants had not made false and misleading statements that Essential filed with the SEC, including the characterization of the $60 million sale of Series B convertible redeemable preferred stock as "equity funding" without any disclosure that the funding would not be

2

considered as equity for Nasdaq listing purposes, representations that the $60 million would be available for Essential's operations, statements that Essential's stock would be traded on Nasdaq, and omitting the probable delisting by Nasdaq.

## II.  JURISDICTION AND VENUE

4.     This action arises under section 18 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78r.

5.     This Court has jurisdiction over this action under section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1331.

6.     Pursuant to section 27 of the Exchange Act and 28 U.S.C. § 1391(b), venue is proper in this District because Defendants were directors or officers of Essential, which maintains its principal place of business in this District, and many of the acts complained of, including the preparation and dissemination of materially false and misleading statements, occurred in this District.  In addition, several Defendants reside in this District.  The Court has jurisdiction over all of the Defendants because, among other things, they have had substantial contacts in the District as a result of their service as directors or officers of Essential.

7.     Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities exchanges in connection with the conduct that is the subject of this Complaint.

## III.  PARTIES

8.     Plaintiff E. Jeffrey Peierls ("Jeff Peierls") resides in Golden, Colorado.  Jeff Peierls made the decision to buy Essential stock for himself and for the other Plaintiffs after reading false or misleading statements in Essential's SEC filings.

9.     Jeff Peierls is President of Plaintiff Peierls Foundation Inc.  Jeff Peierls, in his capacity as President, acted for Peierls Foundation Inc. in connection with its decision to purchase Essential stock.

10.    Jeff Peierls is a trustee of the following trusts:  Under Deed Ethel F. Peierls for Brian E. Peierls; Under Deed Ethel F. Peierls for E. Jeffrey Peierls; Under Deed Edgar S. Peierls for Ethel F. Peierls et al.; Under Deed Jennie N. Peierls for Brian E. Peierls; Under Deed Jennie N. Peierls for E. Jeffrey Peierls; Under Will Jennie N. Peierls for Brian E. Peierls; and Under Will Jennie N. Peierls for E. Jeffrey Peierls.  Jeff Peierls, in his capacity as a trustee, acted for each of the trusts in connection with their decisions to purchase Essential stock.

11.    Defendant James E. Rurka was President and Chief Executive Officer of Microcide Pharmaceuticals, Inc. ("Microcide") prior to its merger with The Althexis Company, Inc. ("Althexis") and name change to Essential (described in more detail below).  Defendant Rurka was a member of the Board of Directors of before and after the merger.

12.    Defendant Mark Skaletsky became President, Chief Executive Officer, and Chairman of the Board of Directors of Essential after the merger.  Defendant Skaletsky was Chairman and Chief Executive Officer of Althexis before the merger.  Defendant

4

Skaletsky was a member of the Board of Directors of Microcide before March 26, 2001. On information and belief, Defendant Skaletsky resides in Massachusetts.

13.    Defendant John P. Walker was Chairman of the Board of Microcide before the merger and was a director of Essential after the merger until approximately February 10, 2003. Defendant Walker was on the Microcide Board of Directors subcommittee responsible for the merger and funding negotiations.

14.    Defendant David Schnell was a director of Microcide before June 5, 2001. He resigned because of his involvement in the negotiations regarding the potential merger and financing. Defendant Schnell was the managing partner of one of the venture capital companies. At the time of the merger, he was nominated to the Board of Directors of Essential by venture capitalists that provided the $60 million in funding.

15.    Defendant Paul J. Mellett was Chief Financial Officer of Althexis before the merger and has been Senior Vice President, Chief Financial Officer, and Treasurer of Essential since the merger. On information and belief, Defendant Mellett resides in Massachusetts.

16.    Defendant Kate Bingham has been a director of Essential since the merger. She was nominated to the Board of Directors of Essential by venture capitalists that provided the $60 million in funding.

17.    Defendant Charles W. Newhall III has been a director of Essential since the merger. He was nominated to the Board of Directors of Essential by venture capitalists that provided the $60 million in funding.

5

18.     Defendant Richard Aldrich was a director of Essential until approximately February 10, 2003. On information and belief, Defendant Aldrich resides in Massachusetts.

## IV. FACTS

19.     On July 30, 2001, Microcide Pharmaceuticals, Inc. ("Microcide") announced a proposed acquisition of The Althexis Company, Inc. ("Althexis") through a merger transaction. The post-merger company would be named Essential Therapeutics, Inc. ("Essential"). Microcide shares were then trading on Nasdaq at $4.19. Microcide also announced a proposed $60 million "private equity funding" through the sale to a group of venture capitalists of preferred stock convertible at $3.00 per share. The July 30, 2001 announcement was contained in Microcide's Form 8-K filed with the SEC as of August 6, 2001. Defendant Rurka signed the Form 8-K.

20.     On October 25, 2001, Microcide and Althexis announced that their shareholders had approved the merger to form Essential as well as the $60 million "private equity funding." Microcide and Althexis also announced that Essential "will continue to trade on the Nasdaq National Market" and that Essential would use the proceeds from the "equity" funding to "further accelerate our promising research programs into development." On November 8, 2001, Essential filed with the SEC a Form 8-K that included the October 25, 2001 press release and that repeated the characterization of the $60 million financing as "private equity funding." Defendant Skaletsky signed the Form 8-K.

6

21.    Essential again referred to the $60 million financing as "private equity funding" in its Form 10-Q filed with the SEC on November 14, 2001 for the quarter ended September 30, 2001.  Defendants Skaletsky and Mellett signed the Form 10-Q.

22.    Jeff Peierls began following Microcide in May 2000.  As part of his research, Jeff Peierls read the July 30, 2001 press release, the October 25, 2001 press release, and the November 14, 2001 Form 10-Q for the period ended September 30, 2001.

23.    Based on his research, Jeff Peierls believed Essential was an attractive investment because of the merger, the $60 million "private equity funding," trading price, and apparent promise of Essential's product.  The $60 million "private equity funding" was especially important to Jeff Peierls.  Jeff Peierls understood, based on Essential's representations, that Essential likely would have sufficient cash to fund operations through at least 2003 because of the funding and that Essential stock likely would keep trading on Nasdaq.

24.    Jeff Peierls began buying Essential stock for himself and several family trusts on February 6, 2002.  The majority of the purchases were made in February, April, and May of 2002.  Attached as Exhibit A is a chart listing Plaintiffs' purchases of Essential stock.

25.    During this time period, Jeff Peierls continued to review information about Essential.  Among other things, he read several press releases issued by Essential as well as pertinent portions of Essential's Form 10-K filed with the SEC on March 29, 2002 for the year ended December 31, 2001.  The Form 10-K, at Note 7 to the financial

7

statements, again describes the $60 million in funding as "equity" financing: "In October 2001, Essential completed an *equity financing* by way of a private placement of an aggregate of 60,000 shares of its Series B convertible redeemable preferred stock for a total purchase price of $60.0 million to a number of venture capital investors." (Emphasis added.) The Form 10-K was signed by Defendants Skaletsky, Mellett, Aldrich, Bingham, Newhall, Rurka, Schnell, and Walker. The $60 million in "equity financing" continued to be important to Jeff Peierls as he purchased Essential stock for himself and his family's trusts.

26.     Once the majority of purchases were made by mid-May of 2002, Jeff Peierls periodically reviewed Essential press releases. He saw an August 15, 2002 press release about the appointment of a new chief operating officer, an October 4, 2002 press release about the appointment of a new senior vice president of regulatory affairs, and a November 6, 2002 press release about Essential's financial results and initiation of a new clinical trial.

27.     Jeff Peierls made a small amount of additional purchases in October 2002 and on November 13, 2002.

28.     On November 13, 2002, Jeff Peierls saw a press release of that date. That press release states that Essential failed to comply with Nasdaq listing requirements for minimum shareholder equity because the Series B preferred stock could not be included in shareholder equity. The press release also said that delisting would entitle the holders of the Series B preferred stock to redeem their stock in return for a $60 million payment by Essential and that Essential did not have the required

funds. The press release reported a proposal by Essential for converting the Series B preferred stock to common stock in order to avoid delisting.

29.    Essential's shareholders rejected the proposal for conversion of the Series B preferred stock on January 23, 2003. On January 31, 2003, Essential announced that it had received a letter from Nasdaq determining that Essential would be delisted on February 10, 2003 for failure to meet the minimum shareholder equity requirements. Essential then issued several press releases regarding efforts to appeal Nasdaq's decision and to enter into an arrangement with the holders of the Series B preferred stock that would avoid redemption for $60 million. On April 11, 2003, Essential announced that its stock would be delisted on April 14, 2003. On May 2, 2003, Essential announced that it had filed for bankruptcy protection.

30.    The November 13, 2002 press release was the first notice that Jeff Peierls or any of the other Plaintiffs had that the Series B preferred stock could not be counted toward shareholder equity for purpose of the Nasdaq listing requirements. Before November 13, 2002, Jeff Peierls had not seen any earlier documents disclosing that Essential was at risk of being delisted by Nasdaq or that the $60 million funding would not be considered equity for Nasdaq listing purposes. Jeff Peierls' review of the November 13, 2002 press thus was the first time that any of the Plaintiffs became aware that Essential's SEC filings describing the $60 million funding as equity financing, representing that the $60 million would be available for Essential's operations, stating that Essential's stock would be traded on Nasdaq, and failing to disclose (as explained below) that delisting was imminent, were false or misleading.

9

31.    If Jeff Peierls or any of the other Plaintiffs had been aware that the Series B preferred stock would not be considered shareholder equity for Nasdaq listing purposes, they would not have purchased any Essential stock. The viability of Essential depended on the Series B preferred stock being equity for purposes of maintaining Nasdaq listing status. From the time the Series B stock was issued, those securities would have to be counted as equity for Essential to meet the Nasdaq listing requirements except for a very short time span. Essential was at a stage where product development was going to cost more than its revenues could support. Shareholder equity thus inevitably would decrease. Jeff Peierls and the other Plaintiffs, however, understood from Essential's representations contained in its SEC filings that the shareholder equity included the $60 million "equity funding." With that $60 million, Jeff Peierls expected Essential to be viable.

32.    Without that $60 million, it was only a matter of a very short period of time before shareholder equity would fall below the Nasdaq listing requirements, forcing redemption of the Series B preferred stock with a required return of the $60 million funding, leaving Essential without the funds necessary to survive. The price that Plaintiffs paid for Essential stock was affected by Essential's false or misleading statements in its SEC filings describing the $60 million funding as equity financing without any disclosure that the funding would not be considered as equity for Nasdaq listing purposes, representing that the $60 million would be available for Essential's operations, and stating that Essential's stock would be traded on Nasdaq. The price would have been significantly lower, and none of the Plaintiffs would have purchased

10

any Essential stock, if Essential had disclosed that the $60 million would not qualify as equity for Nasdaq listing requirements, or that Nasdaq listing would be terminated in the very near future, triggering the Series B preferred stock holders' redemption rights and requiring the $60 million to be returned to them. Plaintiffs, consequently, have suffered significant damages because of the false or misleading statements that Defendants made or caused Essential to make in its SEC filings.

## V.   FIRST CLAIM FOR RELIEF
### SECTION 18 OF THE 1934 SECURITIES EXCHANGE ACT, 15 U.S.C. § 78r

33.    Plaintiffs incorporate the allegations above.

34.    Each Defendant made or caused Essential to make a false or misleading statement. The false or misleading statements included the characterization of the $60 million sale of Series B convertible redeemable preferred stock as "equity funding" without any disclosure that the funding would not be considered as equity for Nasdaq listing purposes, representations that the $60 million would be available for Essential's operations, statements that Essential's stock would be traded on Nasdaq, and omitting the probable delisting by Nasdaq.

35.    The false or misleading statements were material.

36.    The false or misleading statements were contained in SEC filings, including but not limited to the press release attached to the August 6, 2001 Form 8-K, the press release attached to the November 11, 2001 Form 8-K, the November 14, 2001 Form 10-Q for the quarter ended September 30, 2001, and the March 29, 2002 Form 10-K for the year ended December 31, 2001.

11

37.    Plaintiffs relied on the false or misleading statements in their purchase of Essential securities.

38.    The statements affected the price that Plaintiffs paid for the Essential shares they purchased.

39.    Plaintiffs sustained damages by relying upon false or misleading statements.

## VI.  SECOND CLAIM FOR RELIEF
### SECTION 20(a) OF THE 1934 SECURITIES EXCHANGE ACT, 15 U.S.C. § 78t

40.    Plaintiffs incorporate the allegations above.

41.    Essential violated section 18 of the Exchange Act by issuing the false or misleading statements described above.

42.    Defendants Skaletsky, Mellett, Rurka, Schnell, and Walker, by virtue of their positions and/or acts described above, had the power to control Essential and actually exercised that power at the time of the wrongdoing.  Defendants, therefore, are controlling persons within the meaning of section 20(a) of the Exchange Act.

43.    As controlling persons, Defendants are liable to Plaintiffs for the damages that Plaintiffs suffered in connection with their purchases of Essential securities.

## VII. DEMAND FOR JUDGMENT

Plaintiffs demand judgment against all Defendants, jointly and severally, for actual damages, consequential and incidental damages, costs, reasonable attorney fees, pre- and post-judgment interest, and such other and further relief as the Court may deem just and proper.

## VIII.JURY DEMAND

Plaintiffs demand a jury on all issues so triable.

Dated:   November 10, 2003

Respectfully submitted,

PEIERLS FOUNDATION, INC. and
E. JEFFREY PEIERLS, Individually and as
Trustee

By their attorneys,

David E. Marder (BBO # 552485)
Robins, Kaplan, Miller & Ciresi L.L.P.
111 Huntington Avenue, Suite 1300
Boston, MA 02199
617-267-2300

*Of Counsel:*
Susan Bernhardt (Colo. Attorney Reg. # 20369)
Netzorg McKeever Koclanes & Bernhardt LLC
1670 Broadway, Suite 500
Denver, CO 80202
303-864-1000