IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PEIERLS FOUNDATION, INC. and E. JEFFREY PEIERLS, individually and as trustee, <br><br> Plaintiffs, <br><br> v. <br><br> JAMES E. RURKA, MARK SKALETSKY, PAUL J. MELLETT, RICHARD ALDRICH, KATE BINGHAM, CHARLES W. NEWHALL III DAVID SCHNELL, and JOHN P. WALKER, <br><br> Defendants. | Civil Action No. 03 CV 12213 EFH |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

This case, to use Judge Aldrich's apt phrase, is dead on arrival and should be dismissed. *See Backman v. Polaroid Corp.*, 910 F.2d 10, 13 (1st Cir. 1990).

Plaintiffs', purchasers of common stock of Essential Therapeutics, Inc. ("Essential" or the "Company") allege that Essential's SEC filings were misleading, because they referred to proceeds from redeemable preferred stock issued by Essential as "private equity funding," when the proceeds from the sale of those securities were not "stockholders' equity" under Securities and Exchange Commission ("SEC") rules and therefore did not count toward satisfying a Nasdaq listing requirement that would apply if, in the future, the trading price of Essential's common stock price fell below $3 per share.

-2-

Essential's SEC filings, however, did <u>not</u> represent that the preferred stock constituted "stockholders' equity" or that it would apply toward satisfaction of Nasdaq listing requirements. To the contrary, some of the very filings upon which Plaintiffs claim to have relied reported that the preferred stock was <u>not</u> part of "stockholders' equity."

For this and several other reasons Plaintiffs' Complaint must be dismissed under Fed. R. Civ. P. 12(b)(6). In particular –

1.   Essential's SEC filings contain no false or misleading statements.

2.   Plaintiffs did not reasonably rely on the statements alleged to be misleading and those statements did not affect the price of Essential's common stock.

3.   Plaintiffs were on notice of their claim more than a year before filing this action and accordingly their claim is barred by the statute of limitations.

4.   Plaintiffs have not pled facts sufficient to show that Defendants Richard Aldrich and John Walker, who signed none of the SEC filings at issue, exercised actual control over the contents of the filings.

This case should be dismissed.

## STATEMENT OF FACTS

James Rurka, Mark Skaletsky, Paul J. Mellett, Richard Aldrich, Kate Bingham, Charles W. Newhall III, David Schnell, and John P. Walker ("Defendants") were officers or directors of Essential, now known as Trine Pharmaceuticals, at the time of the events at issue. Essential was formed in

-3-

October 2001 by the merger of Microcide Pharmaceuticals, Inc. and The Althexis Company, Inc. Complaint ¶ 20. Essential was a company engaged in the development of pharmaceutical products. Complaint ¶ 1. In October 2001, Essential completed a private sale to venture capital investors of 60,000 shares of convertible, redeemable preferred stock (the "Preferred Stock") for a total purchase price of $60 million. Complaint ¶ 19.

Plaintiffs assert that they bought Essential common stock on seven occasions, purchasing a total of 318,900 shares, allegedly in reliance on the statement in several Essential SEC filings that the Preferred Stock was "private equity funding" or "equity financing."[1] Complaint ¶¶ 24, 25, 27.

During 2001, the Company described the private placement of the Preferred Stock in press releases dated July 30, 2001 and October 25, 2001 that were filed with the SEC on Forms 8-K in August and November 2001, and in a Form 10-Q filed with the SEC in November of 2001.[2] Each of these filings refers to the Preferred Stock as "convertible redeemable preferred

---

[1] Plaintiff E. Jeffrey Peierls is an individual residing in Golden, Colorado. Complaint ¶ 8. Mr. Peierls is allegedly the president of the Peierls Foundation, Inc. and a trustee of seven trusts, which are all Plaintiffs together with Mr. Peierls. Complaint ¶¶ 9, 10. Mr. Peierls alleges that he acted for all of the Plaintiffs in connection with their purchases of shares of Essential. *Id.* According to the Complaint, he began following Microcide Inc. (later Essential) in May of 2000. *Id.* ¶ 22.

[2] On a motion to dismiss, the Court may consider documents referenced in the complaint and documents not referenced in the complaint whose authenticity is not in dispute, such as a company's SEC filings. *See Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993) (affirming propriety of considering public filings and documents referred to in complaint on motion to dismiss); *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991) ("[W]hen a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC . . . ."); *In re Raytheon Securities Litigation,* 157 F.Supp.2d 131, 146 (D. Mass. 2001)("[I]n evaluating a motion to dismiss, the Court may consider documents pertinent to the action or referenced in the complaint"). SEC filings and other documents referenced in this memorandum are attached to the affidavit of Matthew C. Applebaum filed herewith.

-4-

stock." Ex. A at 3; Ex. B. at 2; Ex. C. at 6. The August Form 8-K described
the stock's "mandatory redemption provisions." Ex. A. at 3.

Essential's SEC filings in 2002 also described the terms of the
Preferred Stock. On March 29, 2002, Essential filed a Form 10-K for 2001.
Referring to the private placement as a "preferred stock financing," the Form
10-K described the characteristics of the Preferred Stock, including its
mandatory redemption features. Under the heading "Series B Convertible
Redeemable Preferred Stock," Note 7 to the Financial Statements provides in
part:

> Any shares of Series B preferred stock outstanding are
> required to be redeemed in October 2006, the five-year
> anniversary of the closing, at a redemption price equal to
> 100% of the purchase price plus any declared and unpaid
> dividends.
>
> *       *       *
>
> In addition to the mandatory redemption provisions
> described in the previous paragraph, a holder of Series B
> preferred stock will have the right to require Essential to
> redeem such holder's Series B preferred stock . . . upon
> the occurrence of certain events, including but not limited
> to, for a period of five consecutive trading days, there is no
> reported sale price of the common stock, the common
> stock ceases to be listed for trading, and failure by
> Essential to comply with certain limitations on
> indebtedness.

Ex. D, at F-16.

As required by the SEC's financial reporting rules, the Company's
audited financial statements in its Form 10-K accurately reported the
Company's "stockholders' equity" as of December 31, 2001 as $15.781 million.
Ex. D. at F-3. As reported there, "stockholders' equity" included common
stock and additional paid in capital but no amount is attributable to the

Preferred Stock.   Rather, the outstanding Preferred Stock is reported altogether separate from stockholders' equity. *Id.*

Although Mr. Peierls does not allege reading Essential's Form 10-Q filed on May 15, 2002, it also excluded the Preferred Stock from "stockholders' equity," which was reported to be $10.113 million. Ex. E at 3.

Starting at the time of Essential's formation, its common stock traded on the Nasdaq national market system. Complaint ¶¶ 20, 29. When, on July 25, 2002, Essential announced restructuring charges of over $10 million due to the decision not to pursue development of certain pharmaceuticals, it also reported a negative stockholders' equity. Ex. F. Since its common stock was trading at less than $3 per share, it would not satisfy Nasdaq listing standards unless its stock price either increased above that level for ten consecutive days within the next ninety days or its "stockholders' equity" were brought back above $10 million and its stock continued to trade above $1. *See* Ex. G (NASD Manual (Commercial Clearing House September 2002), Rule 4450).   *See also* http://www.nasdaq.com/about/RecentRules.stm#bid (providing links to listing standards).

However, Essential's stock price did not recover and trade above $3. When Essential filed its Form 10-Q for the second quarter of 2002 on August 14, 2002, it continued to report a negative stockholders' equity – with the outstanding Preferred Stock continuing to be reported separately from "stockholders' equity." Ex. H at 4. That filing also stated that "we are not in compliance with [the Nasdaq] stockholders' equity standard" and that "our common stock may be delisted." *Id.* at 25.

Plaintiffs, however, continued purchasing Essential common stock after the August 14 Form 10-Q was filed. Complaint, Exhibit A. Indeed,

-6-

their final purchase was on November 13, 2002, the day that Mr. Peierls allegedly "first" learned that the Preferred Stock was "could not be included in shareholders' equity." Complaint ¶¶ 27-29.

## ARGUMENT

### I.    ESSENTIAL'S REFERENCES TO "PRIVATE EQUITY" WERE ACCURATE AND NOT FALSE OR MISLEADING.

Section 18(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), imposes liability on one who makes or causes to be made in an SEC filing a statement that "was at the time and in light of the circumstances in which it was made false or misleading with respect to any material fact." 15 U.S.C. 78r(a). *See also Stone & Webster, Inc. Sec. Litig.*, 253 F.Supp.2d 102, 135 (D. Mass. 2003). To state a claim under Section 18(a) a plaintiff must allege actual and not "constructive reliance." *Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F.Supp. 49, 56 (D. Mass. 1995). The gravamen of Plaintiffs' claim is that because the Preferred Stock was not "stockholders' equity" for Nasdaq listing purposes, Essential's use of the phrase "private equity funding" was false and misleading.[3] This argument does not withstand scrutiny.

_____

[3] The Complaint also asserts, in passing, that Essential's filings made two misleading "forward-looking" statements: (1) that its stock will trade on the Nasdaq and (2) that it will have sufficient resources to fund operations. Complaint ¶ 3. However, such forward-looking statements may only be the subject of a claim under the federal securities laws if made with "actual knowledge" that the statement was misleading. *See* Section 21E(c)(1)(A)(B) of the Exchange Act (safe harbor for forward looking statements). As a result, Plaintiffs must plead "with particularity facts giving rise to a strong inference" that Plaintiffs had actual knowledge. *See* Section 21D(b)(2) of the Exchange Act. Plaintiffs fail to make even a conclusory allegation of "actual knowledge," let alone set forth facts giving rise to a strong inference of such knowledge. Moreover, Essential's filings set forth meaningful cautionary language that actual results may differ significantly, including specifically with reference to "future capital requirements" and the sufficiency of "existing financial resources," *see, e.g.,* Ex. D at 16, precluding liability independent of Plaintiffs' failure to plead

-7-

**A.    The Preferred Stock Was Accurately Described as "Private Equity."**

The Preferred Stock was private equity. It was private because sold in a private placement, not a public offering. It was equity because as a preferred stock it represented an ownership interest in Essential. *See* Barron's Dictionary of Business Terms 225 (3d ed. 2000) ("Equity" means "residual ownership"); Black's Law Dictionary 540-41 (6th Ed. 1990) ("Equity. A stockholders' proportionate share (ownership interest) in the corporation's capital stock and surplus.").

It did not apply toward "stockholders' equity" for SEC financial reporting purposes because it was redeemable in five years, as Essential's SEC filings fully disclosed. *See* Regulation S-K, § 28(d), codified at 17 C.F.R. § 210.5-02 (preferred stocks "subject to mandatory redemption requirements" are not included in stockholders' equity). [4] It was nonetheless equity, as the term is commonly used. *See, e.g., The Southern Co.*, SEC Release 27323, 2000 WL 1877547 (Dec. 27, 2000) ("Southern's consolidated capitalization consisted of 49.3% equity (*including mandatorily redeemable preferred securities*)") (emphasis added); *In re Jobs.Com, Inc.*, 301 B.R. 187, 192 (N.D. Tex. 2003) ("Without question, [shares of preferred stock subject to mandatory redemption] are 'equity securities.'") (citation omitted); *Snyder v.*

---

actual knowledge. *See, e.g.,* Section 21E(c)(A) of the Exchange Act. *See Meyer v. Biopure*, 221 F.Supp.2d 195, 204 (D.Mass. 2002) ("This cautionary language identifies the risks at issue in the Complaint.... [T]he safe harbor prevents the Plaintiffs from bringing an action based on these forward-looking statements accompanied by meaningful cautionary language.")

[4] The Nasdaq listing requirements use a company's financial statements as reported to the NASD. *See* NASD Rules 4310(c)(14); 4420(e).

-8-

*C.I.R.*, 93 T.C. 529, 546 (U.S. Tax. Court 1989) (classifying preferred stock with redemption features as "equity" rather than as "debt").

**B.    Essential Did Not State that the Preferred Stock Counted Toward Satisfaction of Any Nasdaq Listing Standard.**

None of the filings upon which Plaintiffs' claims are based states that the Preferred Stock was "stockholders' equity" for purposes of Nasdaq listing requirements. In October 2001, Essential stated that the new company formed by the merger "will continue to trade on Nasdaq under the *new symbol* ETRX." Ex. B (press release) (emphasis added). The Company's Form 10-K for 2001 says only that the Company was listed on the Nasdaq:

> Our common stock is traded on the Nasdaq National Market System under the symbol 'ETRX'.[5]

Ex. D. at 25. There is no statement in the Form 10-K or other filings that the Preferred Stock was relevant to the satisfaction of Nasdaq listing requirements. *See Polaroid*, 954 F.2d at 12 (no affirmative duty to disclose absent "inaccurate, incomplete, or misleading prior disclosures") (quoting *Roeder v. Alpha Indus. Inc.*, 814 F.2d 22, 27-28 (1st Cir. 1989)).

**C.    Essential    Excluded    the    Preferred    Stock    from "Stockholders' Equity" in its SEC Filings.**

The Company expressly excluded the outstanding Preferred Stock from "stockholders' equity" in its financial statements filed with the SEC, including in the Form 10-K that Plaintiff alleges reading before making the vast majority of his purchases of Essential stock. In the Form 10-K, the

---

[5] This disclosure is what was required under SEC Regulation S-X requiring a filing to "[i]dentify the principal United States market or markets in which each class of the registrant's common equity is being traded." *See* 17 C.F.R. § 229.201.

-9-

Preferred Stock is carried on the financial statement at $51.775 million. Ex. D, at F-3. The stockholders' equity is stated separately as $15.781 million, an amount reflecting several line items including the common stock, additional paid in capital, and certain liabilities. *Id.* Similarly, the Forms 10-Q filed in May and August of 2002 excluded the Preferred Stock from "stockholders' equity." Ex. E at 3; Ex. H at 3. Thus, Essential's filings – including its Form 10-K on which Plaintiffs claim to have relied – report that the outstanding Preferred Stock is not part of "stockholders' equity." *See White v. Melton*, 757 F.Supp. 267, 272 (S.D.N.Y. 1991) ("The Court must dismiss a complaint founded on allegations of securities fraud if the allegedly omitted or misrepresented information was appropriately disclosed.").

### D.    The Company Disclosed the Terms of the Preferred Stock and Did Not Have a Duty to Explain Publicly Available Listing Requirements.

Essential repeatedly disclosed the terms of the private equity funding, including the mandatory redemption provisions of the Preferred Stock that precluded its reporting as "stockholders' equity," in Essential's filings. Indeed, every one of the filings upon which Plaintiffs allegedly relied stated that the Preferred Stock was redeemable. For example, in the Form 10-K filed on March 29, 2002, the Preferred Stock is described as a $60 million "contractual obligation." Ex. D at 31. It also states that the Preferred Stock is "required to be redeemed in October 2006, or, upon the occurrence of specified adverse events, may be required to be redeemed sooner as is more particularly described in Note 7 to our consolidated financial statements. . . ." *Id.*

-10-

Essential was not required to explain that publicly-available Nasdaq listing standards provided that, if, in the future, the price of its common stock fell below $3 for 30 consecutive days, then it would be required to have $10 million in "stockholders' equity"; that the Preferred Stock did not "count" toward that "stockholders' equity"; or that there was a "risk" that Essential's common stock might fall below $3. *See, e.g., In re Keyspan Corp. Sec. Litig.*, No. 01 CV 5852, 2003 WL 1702279, at * 15 (E.D.N.Y. March 21, 2003) ("Where allegedly undisclosed information is in fact readily accessible in the public domain. . . a defendant may not be held liable for failing to disclose this information.") (citing *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)); *see also Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 977 (9th Cir. 1999) (dismissing securities claim based on alleged non-disclosure of tax requirements affecting the issuer where such information was contained in the tax code and was therefore "publicly available information").

Indeed, courts have dismissed securities claims based on non-disclosure of actual <u>receipt</u> of letters from Nasdaq stating that delisting is imminent, precisely because Nasdaq listing rules are in the public domain. In *Berger v. Beletic*, 248 F.Supp.2d 597 (N.D. Tex. 2003), the Court held that there was no duty to report the receipt of a delisting letter "because delisting criteria and [the Company's] financial information were both publicly available." *Id.* at 604. The court in *In re K-Tel Int'l Inc. Sec. Litig.*, 107 F.Supp.2d 994 (D. Minn. 2000) also rejected an alleged duty to disclose a delisting letter, because the company's balance sheet "disclos[ed] the figures enabling the NASD to assess" the company's compliance with listing

-11-

standards. *Id.*, at 1005. Plaintiffs' entire Complaint assumes a duty to explain publicly available Nasdaq listing rules and no such duty exists.

## II. PLAINTIFFS COULD NOT HAVE REASONABLY RELIED ON THE REFERENCE TO "PRIVATE EQUITY FUNDING" AS A REPRESENTATION AS TO NASDAQ LISTING REQUIREMENTS.

Reliance is an element of a claim brought under Section 18(a). *See Lindner Dividend Fund v. Ernst & Young*, 880 F.Supp. 49, 56 (D. Mass. 1995) ("A plaintiff must specifically allege that he actually read a copy of the document filed with the SEC, or relevant parts of the document reported in some other source, and was induced to act upon specific misrepresentations in the document.") Such reliance must be reasonable. *Cf. id.* at 56 (claims based on "unsupportable" allegations of reliance should be dismissed); *Rodriguez v. Montalvo*, 649 F. Supp. 1169, 1177 (D. P.R. 1986) ("due diligence is a separate element required to establish a cause of action under Rule 10b-5" and is not met where Plaintiff was "reckless").

Here, it would have been unreasonable for Plaintiffs to purchase Essential stock relying on the words "private equity funding" as a representation that the Preferred Stock was "stockholders' equity" under Nasdaq rules. At a minimum, the exclusion of the Preferred Stock from reported "stockholders' equity" in the Company's filings meant that any such reliance was reckless. *See, e.g., Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1518 (10th Cir. 1983) ("[K]nowledge or information contained in a prospectus or an equivalent document authorized by statute or regulation, should be imputed to investors who fail to read such documents"); *In re Seachange Int'l Inc.*, No. Civ. A. 01-12116-DPW, 2004 WL 240317, at * 10 (D. Mass. Feb. 6, 2004)

-12-

(disclosure regarding pending litigation "was certainly enough to alert investors . . . and to prompt them to make further inquiry should they choose to do so").

Minimal diligence required inquiry into whether, under Nasdaq listing rules, the Preferred Stock would be included as "stockholders' equity." *Brown v. E.F. Hutton Group, Inc,* 991 F.2d 1020, 1032 (2d. Cir. 1993) ("An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth."). This is particularly true for Plaintiffs, who assert that they "would not have purchased any Essential stock" if they had been "aware that the Series B preferred stock would not be considered shareholders' equity." Complaint ¶ 31.

## III. PLAINTIFFS CANNOT PROVE THAT THE ALLEGED MISREPRESENTATIONS AFFECTED THE PRICE AT WHICH THEY PURCHASED OR SOLD THEIR SHARES.

In addition to proving reasonable reliance, under Section 18 a plaintiff must prove that he "sustained damages by relying upon false or misleading statements" <u>and</u> "that the purchase or sale price of his shares was affected by such statements." *See Lindner*, 880 F.Supp. at 56; *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp.518, 525 (S.D.N.Y. 1977) (citing 3 L. Loss, Securities Regulation 1752 (2d ed. 1961)) (Section 18 contains a "strict double-barreled causation requirement").

Plaintiffs cannot prove that the asserted misrepresentation affected the price of Essential stock. Essential's stock traded on the Nasdaq national market system, presumptively an efficient market. *See Cammer v. Bloom,* 711 F.Supp.1264, 1292 (D.N.J. 1989) ("We think that, at a minimum, there

-13-

should be a presumption ... that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.")  Nasdaq listing standards were public and known to the market.  *Berger*, 248 F. Supp. 2d at 604 ("NASD requirements for listing are publicly available to investors").  Similarly, the terms of the Preferred Stock – including that it was redeemable –, the Company's determination of stockholder equity, and the relevant SEC rules were all publicly available and known to the market.  As a result, the price of Essential stock reflected this information.  *See Heliotrope*, 189 F.3d at 977 ("The Tax Code is publicly available information, and was therefore part of the total mix of information incorporated by the market into the price of FHI preferred stock.").  *See also Rand v. Cullinet Software, Inc.*, 847 F.Supp. 200, 206 (D. Mass. 1994) (dismissing claim before trial based on "truth on the market defense"); *Biogen Sec. Litig.*, 179 F.R.D. 25, 39 (D. Mass. 1997) (same).

Reported transactions in Essential common stock confirm that the market understood the terms of the Preferred Stock.  On August 14, 2002, the date the Company filed its Form 10-Q filing stating that the "common stock may be delisted" because the Company "is not in compliance with [the] stockholders' equity requirement," the price of Essential stock <u>increased</u> and continued to increase over five of the next six trading days.[6]  Ex. I at 3.  Since

---

[6] The court may take judicial notice of public quotations of stock prices.  *See Blatt v. Muse Tech.*, No. Civ. A. 01-11010-DPW, 2002 WL 31107537, * 4 (D. Mass. Aug. 27, 2002); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 254 n. 9 (S.D.N.Y. 2003).

-14-

the market knew the Preferred Stock did not apply to Nasdaq listing requirements, Plaintiffs will not be able to prove that the price of Essential stock was, at any time, attributable to the allegedly misleading statements.

## IV.   THE COMPLAINT IS BARRED BY THE STATUTE OF LIMITATIONS.

Claims under Section 18(a) must be brought within "one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued." Section 18(c). "Discovery" under Section 18(c) includes "constructive" or "inquiry notice." *See Lindner,* 880 F.Supp. at 53 (applying "reasonable diligence" standard to determine when the limitations period began running for Section 18 claims); *see also Fujisawa Chemical Co. v. Kapoor,* 115 F.3d 1332, 1336 (7th Cir. 1997).[7]

Under an inquiry notice standard, the statute of limitations begins to run when an investor "in the exercise of reasonable diligence discovered or should have discovered the fraud of which he complains." *Young v. LePone,* 305 F.3d 1, 8 (1st Cir. 2002) (citing *Cooperativa de Ahorro y Credito Aguda v. Kidder, Peabody, & Co.,* 129 F.3d 222, 224 (1st Cir. 1997)). When a defendant has "shown the presence of storm warnings," the plaintiff "normally has the burden of pleading and proving facts demonstrating the timeliness of her action." *Id.* (citation omitted).

------------------------

[7] The statute of limitations set forth in Section 18 was not affected by the statute enlarging the limitations period for claims under Section 10(b) of the Exchange Act. *See* 28 U.S.C. 1658. *See Stephenson v. Deutsche Bank A.G.,* 282 F.Supp.2d 1032, 1067 (D. Minn. 2003) (concluding that "the express one-year limitations period [of Section 9 of the Exchange Act] remains in effect" notwithstanding amendment to § 1658 for limitations periods "except as otherwise provided by law.").

-15-

In assessing whether a plaintiff was put on inquiry notice, courts examine "any financial, legal or other data, including public disclosures in the media . . . available to the Plaintiff." *Nairobi Holdings Ltd. v. Brown Brothers Harriman*, No. 02 Civ. 1230, 2003 WL 21088506,at * 3 (S.D.N.Y. May 14, 2003) (citations and internal quotations omitted). Numerous cases hold that public information may constitute inquiry notice. *See, e.g.*, *Bamberg v. S.G. Cowen*, 236 F.Supp.2d 79, 85 (D. Mass. 2002) (granting motion to dismiss based on news articles and public statements by company); *In re Xchange Inc. Sec. Litig.*, No. Civ. A. 00-10322-RWZ, 2002 WL 1969661, at * 2 (D. Mass. Aug. 26, 2002) (granting motion to dismiss based on "press coverage" of a company); *Pilarczyk v. Morrison Knudsen Corp.*, 965 F.Supp. 311 (N.D.N.Y. 1997) ("Any doubt that the Plaintiffs were on inquiry notice is dispelled by [defendants'] third quarter 1994 10-Q...."); *In re General Dev. Corp. Bond Litig.*, 800 F.Supp. 1128, 1140-42 (S.D.N.Y. 1992) (finding inquiry notice based on Company's public filings, including a Form 10-Q and a prospectus).

Plaintiffs' claims are barred because they were filed on November 12, 2003 – more than one year after Plaintiffs knew, or at a minimum were on inquiry notice, of the alleged misrepresentations. The Complaint alleges that because of the phrase "private equity funding," Plaintiffs believed that the Company had an additional $60 million in stockholders' equity and therefore would not be subject to delisting. Complaint ¶ 2, 31-32. The Complaint alleges that Plaintiffs did not know of a "risk of being delisted" until reading a November 13, 2002 press release stating that the Company was "not in compliance with listing standards." Complaint ¶ 30. However, Plaintiffs had actual or constructive knowledge that the Preferred Stock was not

-16-

stockholders' equity and, moreover, of the express risk of being delisted well before November 12, 2002.

In a press release dated July 25, 2002, the Company reported a stockholders' deficit of $6.628 million. Ex. F. The press release, like the previous filings, expressly excluded the Preferred Stock from stockholders' equity. Since Plaintiffs are chargeable with knowledge of the public Nasdaq listing standards, this press release was more than sufficient to trigger the limitations period.

In addition, the Company filed a Form 10-Q for the second quarter of 2002 with the SEC on August 14, 2002, that did not even require Plaintiffs to know (or inquire about) Nasdaq listing requirements. The Form 10-Q states:

> "OUR COMMON STOCK MAY BE DELISTED."
>
> * * *
>
> All companies listed on Nasdaq are required to comply with certain continued listing standards, including maintaining stockholders' equity of at least $10,000,000 or a minimum bid price of at least $1.00. We are not in compliance with [Nasdaq's] stockholders' equity standard as of June 30, 2002.
>
> We cannot assure you that any appeal of any Nasdaq delisting determination will prove successful.

Ex. H at 25 (emphasis added). In the financial statements filed with the Form 10-Q, the Company again reported a stockholders' deficit, as it had in the July press release. *Id.* at 3.

The Company's public statements went beyond providing "storm warnings" to a loud "thunderclap." The very risk that Plaintiffs say they

were misled to believe would not materialize – delisting due to insufficient stockholders' equity – was disclosed. *See, e.g., Salinger v. Projectavision*, Inc., 934 F.Supp. 1402, 1411 (S.D.N.Y. 1996) ("Where the company's public disclosure reveals that a particular representation about a crucial feature of an investment has not materialized, the statute of limitations is triggered."). As a matter of law, Plaintiffs were required to file their Complaint no later than August 14, 2003.

## V. RICHARD ALDRICH AND JOHN WALKER SHOULD BE DISMISSED FROM THIS LAWSUIT BECAUSE THEY DID NOT SIGN ANY FILINGS ON WHICH PLAINTIFFS ALLEGEDLY RELIED.

The Complaint does not state a claim against Walker and Aldrich for the additional reason that it fails to allege that either of them "made or caused to be made" the alleged misrepresentations. *See* Section 18(a). Neither Richard Aldrich nor John Walker signed Essential's Form 10-Q filed with the SEC on November 14, 2001 or its Form 10-K filed with the SEC on March 29, 2002, on which Plaintiffs claim reliance. *See* Ex. C at 26-27; Ex. D at 39. Neither of them signed the Forms 8-K referenced in the Complaint. Ex A at 6; Ex. B. at 3. The allegations as to Walker and are Aldrich are merely that they served as directors of Essential, and in the case of Walker, that he was a director of Microcide Inc. before Essential was formed and was "responsible for the merger and funding negotiations." Complaint ¶¶ 13, 18. Both Walker and Aldrich were outside directors of Essential. *See* Ex. D at 39.

The Complaint does not state a claim against either Walker or Aldrich because it fails to allege facts that "connect [them] specifically" to the allegedly false statements. *In re Cabletron Sys., Inc.*, 311 F.3d 11, 41 (1st Cir.

-18-

2002) (dismissing claim under Rule 10b-5 against outside director who "did not sign" the SEC filing and who were not connected "specifically" to alleged misrepresentations). It does not allege the "exercise of control" with respect to any of the alleged false filings. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002) (dismissing control person claims where Complaint did not plead "facts . . . permitting an inference that [defendants] actually exercised control over [the entity primarily liable].")

The mere allegations of director status would be insufficient to state a claim of control person liability even if Walker or Aldrich had signed an allegedly false filing. *See In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33, 44 (D. Mass. 2002) ("Where the defendant's status is merely that of outside director. . . the defendant's signature on the SEC filing does not necessarily constitute an exercise of any power or control over its contents.").

The Complaint fails to allege a claim for primary violations or control person liability against Walker or Aldrich.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant their motion to dismiss on the grounds that Essential's filings were not false or misleading, Plaintiffs did not reasonably rely on the statements alleged to be misleading and those statements did not affect the price of Essential's stock, and Plaintiffs' claims are barred by the applicable statute of limitations. Defendants' Motion to Dismiss Plaintiffs' Complaint, therefore, should be allowed and the Complaint should be dismissed in its entirety.

-19-

Respectfully submitted,

**JAMES RURKA,
MARK SKALETSKY, PAUL J.
MELLETT, RICHARD ALDRICH,
KATE BINGHAM, CHARLES W.
NEWHALL III, DAVID SCHNELL,
AND JOHN P. WALKER,**

By their attorneys,

Steven W. Hansen (BBO# 220820)
Matthew C. Applebaum (BBO# 653606)
**Bingham McCutchen LLP**
150 Federal Street
Boston, MA 02110
(617) 951-8000

Dated:        February 17, 2004.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was served upon counsel for Plaintiffs, David E. Marder, Robins, Kaplan, Miller & Ciresi, L.L.P., 111 Huntington Ave., Boston MA 02199, by hand on February 17, 2004.

Matthew C. Applebaum