# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PEIERLS FOUNDATION INC. and
E. JEFFREY PEIERLS, individually and as trustee for Under Deed Ethel F. Peierls for Brian E.
Peierls, Under Deed Ethel F. Peierls for E. Jeffrey Peierls, Under Deed Edgar S. Peierls for Ethel
F. Peierls et al., Under Deed Jennie N. Peierls for Brian E. Peierls, Under Deed Jennie N. Peierls
for E. Jeffrey Peierls, Under Will Jennie N. Peierls for Brian E. Peierls, and Under Will Jennie
N. Peierls for E. Jeffrey Peierls

      Plaintiffs,

v.

JAMES E. RURKA,
MARK SKALETSKY,
PAUL J. MELLETT,
RICHARD ALDRICH,                         Civil Action No. 03-12213EFH
KATE BINGHAM,
CHARLES W. NEWHALL III,
DAVID SCHNELL,
JOHN P. WALKER,

      Defendants.

---

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs (collectively, "the Peierls") respond to Defendants' Motion to Dismiss ("Motion") as follows:

## I.    INTRODUCTION

In their Motion, Defendants (officers and directors of Essential Therapeutics, Inc. ("Essential")) admit that they characterized the Series B preferred stock as "equity" in Essential's public filings, even though the Series B preferred stock was not "equity" for the purpose of Nasdaq's listing requirements. Defendants thus hid Essential's serious financial problems from the investing public, including Plaintiff E. Jeffrey Peierls ("Jeff Peierls"), by mischaracterizing the Series B preferred stock as "equity," failing to disclose that the Series B stock would not be considered "equity" when determining whether the stock could be traded, and falsely stating that Essential had sufficient funds to keep operating through 2003. Nor did public filings that Jeff Peierls read disclose that if Essential's stock stopped trading on the Nasdaq National Market – as opposed to any Nasdaq market – the company could be required to repay $60 million to the preferred stockholders.

Defendants try to evade responsibility for their misleading disclosures by insisting that Jeff Peierls could have figured out that the statements were misleading if he had performed extensive research and read every one of Essential's public filings. The securities laws do not require this of investors. Rather, they required the defendants to make complete and accurate disclosures.

Further, Defendants' Motion asks this Court to make factual determinations that are exclusively within the jury's province. The Motion, at most, demonstrates that issues of fact exist regarding the interpretation of language in Essential's SEC filings. Whether a reasonable investor should have read prior filings as part of his "due diligence" before buying Essential

1

stock is a fact question. What a reasonable investor would have understood from the various filings likewise is a fact question. The Court, consequently, should deny Defendants' motion.

## II. FACTS ALLEGED IN THE COMPLAINT

Essential, whose stock was publicly traded on the Nasdaq National Market, was formed in July 2001 after the merger of Microcide Pharmaceuticals, Inc. and The Althexis Company, Inc. (Complaint ¶ 6; Motion Ex. B.) Microcide issued a press release announcing the merger on July 30, 2001. The press release stated that "[c]oncurrent with the merger, the combined entity [i.e., Essential] will receive $60 million in *private equity funding*." (Complaint ¶ 19; Motion Ex. A (emphasis added).) It further stated that "the major new financing of $60 million associated with this merger *will provide the resources* to aggressively develop the combined business going forward." (Motion Ex. A (emphasis added).) The press release was included with Microcide's Form 8-K filed with the SEC and signed by Defendant Rurka on August 3, 2001. (Complaint ¶ 19; Motion Ex. A.) The July 30, 2001 press release did not give any indication that the $60 million "private equity funding" would not count toward Nasdaq listing requirements or that the risk of delisting was imminent because of this fact.

Essential issued another press release on October 25, 2001, extolling the company's financial strength. This press release stated that "[a]lso approved at the special meeting was a $60 million *private equity funding*" and that the "[p]roceeds of the current financing will be used to further accelerate our promising research programs into development." (Complaint ¶ 20; Motion Ex. B (emphasis added).) The press release further stated that "[t]he Company *will continue to trade on the Nasdaq National Market* under the new symbol 'ETRX' . . . ." (Complaint ¶ 20; Motion Ex. B (emphasis added).) This press release was included with Essential's Form 8-K that was signed by Defendant Skaletsky on November 8, 2001. This press

2

release did not disclose any risk that the $60 million "private equity funding" would not count toward Nasdaq listing requirements or that the risk of delisting was imminent.

On November 14, 2001, Essential filed its Form 10-Q, which was signed by Defendants Skaletsky and Mellett. (Complaint ¶ 21; Motion Ex. C.) In the "Notes to Condensed Financial Statements" accompanying this Form 10-Q, the $60 million is again mischaracterized as "equity." Note 1, entitled "Summary of Significant Accounting Policies," stated:

> Essential Therapeutics . . . closed *an equity financing* that raised an aggregate $60 million dollars through a private placement of Series B convertible redeemable preferred stock . . . . The accompanying financial statements represent the financial position of Essential Therapeutics . . . without giving effect to the acquisition of The Althexis Company or the $60 million *private equity financing*.

(Motion Ex. C (emphasis added).) Note 5 then twice refers to the $60 million as "equity financing." (*Id.*) In the item on "Management's Discussion and Analysis of Financial Condition and Results of Operations," the Form 10-Q against refers to the $60 million as "equity financing" and goes on to state that "Essential Therapeutics expects that its existing capital resources, including the funds from *the October 2001 private equity financing . . . will enable Essential Therapeutics to maintain current and planned operations at least through 2003*." (Motion Ex. C (emphasis added); *see* Complaint ¶ 21.) The Form 10-Q never discussed the possibility that the $60 million "private equity funding" would not count toward Nasdaq listing requirements, that a risk of delisting was imminent, or that the $60 million would not be available for operations.

Jeff Peierls, who invests money for himself and the other Plaintiffs, began researching Essential in May 2000. (Complaint ¶¶ 8-10, 22.) He later read the July 30, 2001 press release, the October 25, 2001 press release, and a November 14, 2001 Form 10-Q for the period ended September 30, 2001. (*Id.* ¶ 22.) Each of these documents was filed by Essential and contained the above misrepresentations and nondisclosures. Based on the misleading statements and omissions in these documents, Jeff Peierls believed "that Essential likely would have sufficient

3

cash to fund operations through at least 2003 because of the funding and that Essential stock likely would keep trading on Nasdaq." (*Id.* ¶ 23.)

Jeff Peierls began buying Essential stock for the Peierls in February 2002 and completed most of the purchases by May 15, 2002. (*Id.* Ex. A.) During this period, he continued reading Essential's public filings, including its December 31, 2001 Form 10-K dated March 29, 2002. (*Id.* ¶ 25.) In this document, Defendants continued to refer to the $60 million sale of Series B preferred stock as "equity financing" without any qualifying language. In the item entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," the Form 10-K specifically provided: "Simultaneously with [Essential's acquisition of Althexis], Essential completed an *equity financing* by way of a private placement of an aggregate of 60,000 shares of its Series B convertible redeemable preferred stock for a total purchase price of $60.0 million to a number of venture capital investors." (Motion Ex. D at 27 (emphasis added).) In that same item, Defendants explained that these funds constituted "private equity funding" that would fund operations "at least through 2003." (Motion Ex. D at 31.)

The Form 10-K also included Essential's Consolidated Balance Sheets for the periods ending December 31, 2000 and December 31, 2001. These Balance Sheets showed the 60,000 shares of Series B preferred stock listed twice – once, as a specific line-item under the heading "Stockholders' Equity." The Notes to Consolidated Financial Statements accompanying these Balance Sheets referred to the $60 million from the sale of the Series B preferred stock as "equity financing" at least four separate times. (Motion Ex. D at F-7, F-16 to –18; Complaint ¶ 25.) In the note on "Stockholders' Equity," the Preferred Stock is the first item discussed:

8.    STOCKHOLDERS' EQUITY
      PREFERRED STOCK

4

The Company is authorized to issue 5,000,000 shares of preferred stock. The Company's Board of Directors may set rights and privileges of any preferred stock issued. In October 2001, the Company issued 60,000 shares of Series B convertible redeemable preferred stock *in a private equity financing* (see Note 7).

(Motion Ex. D. at F-18 (emphasis added).) Similar to Essential's earlier filings, the Form 10-K never disclosed that this $60 million would not count toward Nasdaq listing requirements and thus made imminent the risk of delisting and obligation to repay the $60 million.

The significance of these misrepresentations and omissions is unmistakable. As the Peierls alleged:

The viability of Essential depended on the Series B preferred stock being equity for purposes of maintaining Nasdaq listing status. From the time the Series B stock was issued, those securities would have to be counted as equity for Essential to meet the Nasdaq listing requirements except for a very short time span. Essential was at a stage where product development was going to cost more than its revenues could support. Shareholder equity thus inevitably would decrease. Jeff Peierls and the other Plaintiffs, however, understood from Essential's representations contained in its SEC filings that the shareholder equity included the $60 million "equity funding." With that $60 million, Jeff Peierls expected Essential to be viable.

Without that $60 million, it was only a matter of a very short period of time before shareholder equity would fall below the Nasdaq listing requirements, forcing redemption of the Series B preferred stock with a required return of the $60 million funding, leaving Essential without the funds necessary to survive.

(Complaint ¶¶ 31, 32.)

Thereafter, the Peierls kept informed about Essential by reading its press releases. (*Id.* ¶ 26.) Jeff Peierls read three Essential press releases between August and November 2002 that contained no warnings that the Series B preferred stock could not be considered "equity" or that Essential's stock faced a likelihood of delisting by Nasdaq. (*Id.*) Jeff Peierls then read Essential's November 13, 2002 press release and discovered for the first time that the Series B preferred stock would not be considered "equity" and that Essential had thus not met Nasdaq's listing requirements. (*Id.* ¶¶ 28-30.) On November 12, 2003, the Peierls filed this action.

5

## III. THE COMPLAINT SHOULD NOT BE DISMISSED BECAUSE IT STATES A CLAIM UNDER SECTION 18 OF THE 1934 SECURITIES EXCHANGE ACT

The Court must construe the Complaint in the light most favorable to the Peierls, and "dismissal is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987) (internal quotations omitted); *see* Fed. R. Civ. P. 12(b)(6). The Court must "assume the well-pleaded facts as they appear in the complaint to be admitted, indulging every reasonable inference in favor of the non-moving party." *Linder Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49, 53 (D. Mass. 1995). "In ruling on a motion to dismiss . . . a court should not decide questions of fact." *See Roeder*, 814 F.2d at 24-25.

"[Section] 18(a) creates a private cause of action against persons . . . who 'make or cause to be made' materially misleading statements in any reports or other documents filed with the [Securities Exchange] Commission." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979). To state a claim under Section 18(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 78r(a), the Peierls had to allege that: (1) Defendants made or caused to be made a false or misleading statement; (2) the statement was material; (3) the statement was contained in an SEC filing; (4) Plaintiffs relied on the statement in their purchase of the security; and (5) Plaintiffs purchased at a price affected by the statement and sustained damages caused by their reliance on the statement. *In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.*, 271 F. Supp. 2d 1007, 1025 (E.D. Mich. 2003); 9 Louis Loss & Joel Seligman, *Securities Regulation* 4296-98 (3d ed. 1992).

Defendants incorrectly argue that the statements identified by the Peierls were not false or misleading, that the Peierls' reliance on those statements was unreasonable, and that these statements did not affect the price at which the Peierls purchased their shares of Essential stock. On the contrary, the Peierls sufficiently pleaded facts supporting each of these elements.

6

**A.**      ***Defendants Made or Caused to Be Made False or Misleading Statements in Essential's Filings with the SEC***

Whether a statement is misleading is generally a question of fact reserved for the trier of fact. *In re PLC Sys., Inc. Sec. Litig.*, 41 F. Supp. 2d 106, 116 (D. Mass. 1999).

## 1.      Mischaracterization of Series B Preferred Shares as Equity

The Peierls alleged that Defendants' statements in Essential's SEC filings characterizing the Series B preferred shares as "equity" were misleading. The Peierls alleged that the reported statements mischaracterized the preferred shares as "private equity funding" or "equity financing" in at least four SEC filings without disclosing that those shares could not be considered equity for Nasdaq listing purposes. (Complaint ¶¶ 19-21, 25.) Defendants also misrepresented that Essential's stock "will continue to trade on the Nasdaq National Market" in an October 25, 2001 press release filed with Essential's November 8, 2001 Form 8-K. (*Id.* ¶ 20.)

In *In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.*, 271 F. Supp. 2d 1007, 1025-26 (E.D. Mich. 2003), the court ruled that similar allegations precluded dismissal of the plaintiffs' Section 18 claim on a 12(b)(6) motion. After the plaintiffs purchased stock in reliance on the company's financial statements, they asserted claims against the company's auditor, directors, and officers. *Id.* at 1025. The plaintiffs alleged that the auditor made "unqualified" opinions about the company's financial condition and about the audit's compliance with Generally Accepted Accounting Principles. *Id.* Later, the company announced that the auditor's opinions were unreliable. *Id.* The court concluded that the plaintiffs' allegations of false and misleading statements were sufficient to withstand a 12(b)(6) motion. *Id.* at 1025-26. Here, the Peierls alleged that Defendants represented that the Series B preferred stock constituted "equity" without explanation or qualification that it would not be considered "equity" for the purpose of meeting Nasdaq's listing requirements. (Complaint ¶¶ 3, 34.) Months after making these false

7

statements, Defendants confessed in a press release that the preferred stock was not equity and would not count towards the Nasdaq listing requirements. (Complaint ¶ 28.)

The mischaracterization of the Series B preferred stock as "equity" was significant. The correct characterization went to Essential's continued viability as a company and was significant to Jeff Peierls when he invested in Essential for the Peierls. The Complaint alleges, and the Court must accept as true, the following:

> Based on his research, Jeff Peierls believed Essential was an attractive investment because of the merger, the $60 million "private equity funding," trading price, and apparent promise of Essential's product. The $60 million "private equity funding" was especially important to Jeff Peierls. Jeff Peierls understood, based on Essential's representations, that Essential likely would have sufficient cash to fund operations through at least 2003 because of the funding and that Essential stock likely would keep trading on Nasdaq.

(Complaint ¶ 23.) The Complaint explained that without the $60 million being considered equity, Essential could be forced to return the $60 million funding, thus "leaving Essential without the funds necessary to survive." (Complaint ¶ 32.)

Defendants wrongly assert that they described the Series B preferred stock accurately when they referred to it as "equity." (Motion at 7.) Defendants proceed to identify the fallacy of their own argument, admitting that these shares "did not apply toward 'stockholder equity'" for certain purposes. (*Id.*) The purported dual meaning of "equity," as claimed by Defendants, demonstrates precisely why and how their representation was misleading, especially considering the far-reaching ramifications of the Series B preferred stock not being equity for Nasdaq listing purposes. Defendants should have affirmatively disclosed *both* meanings in their public filings. The Peierls identify this precise problem in their Complaint as one of the grounds underlying their Section 18 claim. (Complaint ¶¶ 2-3, 32.)

Defendants' argument improperly seeks to require investors to make hairsplitting distinctions as to the meaning of "equity" in particular legal contexts. Defendants at best identify

an ambiguity in their use of the term "equity." That ambiguity creates a question of fact and is not properly addressed at this early stage of the proceedings. *Foisy v. Royal Maccabees Life Ins. Co.*, 356 F.3d 141, 148 (1st Cir. 2004).

### 2. Failure to Disclose that Series B Preferred Shares Would Not Count Toward Nasdaq Listing Requirements

Courts have recognized that a party's failure to disclose material information in SEC filings constitutes an independent basis for imposing liability under Section 18. *Magna Inv. Corp. v. John Does One Through Two Hundred*, 931 F.2d 38, 39 (11th Cir. 1991); *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir.1990); *see also* 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.18, at 672 (4th ed. 2002). Defendants admit that they failed to disclose that these shares would not count toward Nasdaq's minimum equity thresholds: "There is no statement in the Form 10-K or other filings that the Series B preferred stock was relevant to the satisfaction of the Nasdaq listing requirements." (Motion at 8.) The Peierls pleaded this failure to disclose as a basis underlying their Section 18 claim. (Complaint ¶ 3.)

### 3. Excluding $60 Million "Equity Financing" from "Stockholders' Equity"

Defendants identify three documents filed with the SEC where they describe the Series B preferred stock as "equity" but purportedly excluded it from "stockholder equity" elsewhere in the same documents. (Motion Exs. D (Form 10-K dated March 29, 2002), E (Form 10-Q dated May 15, 2002), H (Form 10-Q dated August 14, 2002).) Defendants incorrectly contend that by excluding the Series B preferred stock from this computation, they did not make any misleading statements as a matter of law. Their contention is flawed for several reasons.

First, before Essential filed any of these forms, the Peierls read and relied on at least three SEC filings made by Defendants that simply referred to the Series B preferred stock as "equity" without any purported exclusion from "stockholders' equity." (Complaint ¶¶ 19-21; Motion Exs.

9

A, B, C.) The filings that lead the Peierls to begin investing do not even discuss the computation of "stockholders' equity" or any potential distinction between "equity" and "stockholders' equity." (Complaint ¶¶ 22-24.)

Second, Defendants' purported exclusion of the preferred stock from a computation of "stockholder equity" does not change the fact that Defendants described the Series B preferred stock as "equity" in those filings. In the Consolidated Balance Sheets included in each of the forms, Defendants listed the 60,000 shares of Series B preferred stock as a separate line-item under the category "Stockholders' equity." (*See supra* pp. 6-7.) This is explicitly prohibited by SEC regulations specifying the information that should appear in the line-items for companies' balance sheets and the accompanying notes. 17 C.F.R. § 210.5-02(28)(d) ("Securities reported under th[e] caption [Redeemable Preferred Stocks] are not to be included under a general heading 'stockholders' equity' . . . ."). In the Notes to the Consolidated Financial Statements included with Essential's March 29, 2002 Form 10-K, Stockholders' Equity is defined as including the Series B preferred stock. (Motion Ex. D at F-18.) The listing and description of the preferred stock at a minimum gives rise to a fact question as to whether Defendants' characterization of the preferred stock was misleading.

Finally, Jeff Peierls read only one of the documents identified by Defendants that purportedly excluded the Series B preferred stock from the computation of "stockholder equity." Jeff Peierls read the Form 10-K filed on March 29, 2002. This document specifically referred to the Series B preferred stock as "equity financing." A reasonable investor would have no reason to know that this stock would not be considered equity for Nasdaq listing purposes and thus result in the company's delisting and the redemption of the Series B preferred stock. Moreover, the Peierls had already relied on earlier Essential filings and invested over $151,000 in Essential

10

before Defendants filed this Form 10-K. (Complaint Ex. A.) At a minimum, the conflicting language in the Form 10-K creates a fact question.

The two other SEC filings that purportedly excluded the Series B preferred stock in computing "stockholder equity" are red herrings. The Peierls did not allege that they read those filings and, in fact, did not. Further, the vast majority of the Peierls' purchases – about $870,000 – occurred prior to the filing of either of these documents. (*Id.*)

### 4.    Terms of Series B Preferred Stock and Nasdaq Listing Requirements

#### a)    *Terms of Preferred Stock*

Defendants' inclusion of the terms of the preferred stock in one of their filings does not excuse Defendants from making misleading disclosures in other filings. Jeff Peierls read filings that did not contain the terms. He was entitled to rely on Defendants' characterizations in what he read and none of the cases Defendants cite establish an obligation to read all other information to determine if Defendants' representations were false. Even the filing containing the terms was misleading because that filing described the preferred stock as "equity." Although Defendants admit that they could not report the Series B preferred stock as "equity" (Motion at 9), they did precisely that in their SEC filings. Moreover, the first warning from Essential and Defendants of the possible delisting did not occur until August 2002, and the Peierls did not become aware of that warning until several months later.

#### b)    *Nasdaq Listing*

Defendants interject a straw-man argument, claiming that the Peierls Complaint is based on a failure to disclose the Nasdaq listing requirements. (Motion at 10-11.) Defendants cite four inapposite cases in support of this argument. *See In re Keyspan Corp. Securities Litigation*, No. 01 CV 5852(ARR), 2003 WL 1702279 (E.D.N.Y. Mar. 21, 2003); *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971 (9th Cir. 1999); *Berger v. Beletic*, 248 F. Supp. 2d 597, 603-04

11

(N.D. Tex. 2003); *In re K-Tel Int'l Inc. Sec. Litig.*, 107 F. Supp. 2d 994, 1005 (D. Minn. 2000).[1]
These cases do not apply because the Peierls' claims do not rest on the failure to disclosure
Nasdaq listing requirements or on Essential's receipt of a delisting letter. Rather, they allege that
Defendants misrepresented the nature of the Series B preferred shares, making it impossible to
determine how the Nasdaq listing requirements would apply and thereby disguising both the
danger that Essential would be delisted and the financial instability of Essential. If Defendants
had accurately and completely described the Series B preferred stock as excluded from any
category of "equity," the true condition of the company would have been apparent. *See In re
PLC Sys., Inc. Sec. Litig.*, 41 F. Supp. 2d at 115-16 ("'[W]hen a corporation does make a
disclosure – whether it be voluntary or required – there is a duty to make it complete and
accurate.'") (quoting *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir.1990)).

      *Berger*, to the extent it applies, suggests that the Peierls' claims are actionable. The court
there explained that a person has a duty to disclose "when silence would make other statements
misleading or false." Here, Defendants failed to disclose that the Series B preferred stock would
not count toward the Nasdaq listing requirements, which makes the other statements about the
Series B preferred stock being "equity" misleading.

### 5.    None of Defendants' Statements Are Protected by the Safe-Harbor for Forward-Looking Statements

      Defendants incorrectly maintain that their statements that Essential's stock would
continue to trade on Nasdaq and that the $60 million from the Series B preferred stock provided
Essential with sufficient funds to operate through at least 2003 were protected forward-looking

---

[1] Defendants incorrectly characterize the holding of *In re K-Tel International, Inc. Securities Litigation.* The court there did not address whether the defendants had a duty to disclose their receipt of a delisting letter; it discussed only whether the plaintiffs' sufficiently pleaded scienter based on the defendants' failure to disclose their awareness of a letter threatening to delist the company's stock in the context of a Section 10(b) claim. 107 F. Supp. 2d at 1005.

statements. 15 U.S.C. § 78u-5 provides a safe-harbor for certain forward-looking statements if they are either accompanied by "meaningful cautionary language" that identifies the statements as forward-looking or were made without actual knowledge that the statements were false or misleading. This safe harbor does not protect defendants from liability for statements that misrepresent historical or current facts. *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1473 (N.D. Ga. 1997); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1213-14 (1st Cir. 1996); *In re Noven Pharmaceuticals, Inc. Securities Litigation*, 238 F. Supp. 2d 1315 (S.D. Fla. 2002).

The statements identified by Defendants cannot be categorized as "forward-looking." The July 30, 2001 Press Release included the following misleading language: "the major new financing of $60 million associated with this merger will provide the resources necessary to aggressively develop the combined business going forward." (Motion Ex. A.) The October 25, 2001 Press Release misleadingly stated that "[p]roceeds of the current financing will be used to further accelerate our promising research programs into development." (Motion Ex. B.) The Form 10-Q Signed on November 14, 2001 stated that "Essential Therapeutics expects that its *existing capital resources*, including the funds from the October 2001 private equity financing . . . will enable Essential Therapeutics *to maintain current* and planned operations at least through 2003." (Motion Ex. C (emphasis added).) In the Form 10-K signed on March 29, 2002, Defendants stated that "[w]e expect that our *existing capital resources*, including the funds from the October 2001 private equity financing . . . will enable us *to maintain current* and planned operations at least through 2003." (Motion Ex. D (emphasis added).) Each of these statements contains elements of historical fact, namely the $60 million being misrepresented as "equity" and as being available for Essential's operations under Essential's then-current plans to use those funds.

13

The October 2001 press release further stated that Essential "will continue to trade on the Nasdaq National Market." This statement was made in conjunction with announcing the approval of the "$60 million private equity funding." Because this $60 million could at no time be considered "equity" for Nasdaq listing purposes, a then-present risk existed that Essential's stock would ceasing being traded on the Nasdaq National Market. This statement combines elements of past and present facts, excluding it from the protections of the safe harbor.

### B.   The Peierls Sufficiently Pleaded Reliance on Defendants' Misleading Statements Contained in Essential's SEC Filings

The Peierls have satisfied the requirement of pleading actual reliance on Defendants' statements in SEC filings. *Heit v. Weitzen*, 402 F.2d 909, 916 & n.6 (2d Cir. 1968); *Berman v. Richford Indus., Inc.*, 78 Civ. 54, 1978 WL 1104, at *7 (S.D.N.Y. 1978). Defendants acknowledged that the Peierls pleaded reliance on Defendants' characterization of the Series B preferred stock as "equity" in purchasing Essential stock. (Motion at 3.)

Defendants argue for dismissal on the mistaken theory that the Peierls' reliance was unreasonable because various documents filed after the Peierls began purchasing Essential stock purportedly indicated that the Series B preferred stock was excluded from the definition of "stockholders' equity." Defendants have cited no cases holding that Section 18 plaintiffs must plead that their reliance was reasonable. Even assuming the Section 18 requires reasonable reliance, the resolution of this issue is require a factual determination reserved for the jury. *See Bruschi v. Brown*, 876 F.2d 1526, 1529-30 (11th Cir. 1989); *Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 590 (6th Cir. 2000). Contrary to Defendants' assertion, these documents listed the Series B preferred stock as a line item under "stockholder equity" and also explicitly referred to the preferred stock as "equity." Defendants do not identify any statements that would have definitively indicated that Nasdaq would question whether the Series B preferred stock

should have been considered debt or equity. When the Peierls began purchasing Essential's stock, they had already reviewed prior Essential filings that only referred to the preferred stock as "equity" without any alleged contradictions, and Essential had not filed its Form 10-K with these purported contradictory statements. The Peierls thus sufficiently pleaded their reliance. *See Linder Dividend Fund, Inc.*, 880 F. Supp. at 56 (holding that plaintiffs sufficiently pleaded reliance on statements in SEC filings, despite contradictory reports available to plaintiffs when they purchased shares).

The Complaint explains the reasonableness of the Peierls' reliance on the characterizations of the Series B preferred stock as "equity." (Complaint ¶¶ 31-32.) If the $60 million of Series B preferred stock were treated as equity, it would be available to fund the company's operations. Based on the Essential's historical burn rate of capital,[2] $60 million of equity would have funded Essential's operations at least through 2003, if not longer. Essential's statements that it had sufficient capital to fund operations through 2003 reinforced the perception that the $60 million worth of Series B preferred stock was "equity" because Essential would have folded almost instantaneously without the $60 million. If the $60 million were not considered equity, Essential would inevitably be delisted, triggering the redemption of the Series B preferred stock and causing Essential's collapse.

The Peierls had already purchased about $870,000 of Essential stock when Essential first mentioned the possibility of delisting in its Form 10-Q dated August 14, 2002.[3] The Peierls did not read this document or refer to it in their Complaint. After making their initial investments,

---

[2] In the three years preceding the sale of the Series B preferred stock, Essential had sustained an average net loss of $17.6 million per year. (Motion Ex. D at 18.)

[3] This filing also referred to the Series B preferred stock as "equity financing," despite containing cautionary language about delisting. (Motion Ex. H at 13.)

Jeff Peierls periodically reviewed Essential press releases – none of which discussed the possibility of delisting or that the Series B preferred stock was not equity. (Complaint ¶ 26.)

Defendants basically argue that their statements were so confusing that no one should have relied on them. Accepting their argument would undermine the entire purpose behind the federal securities laws (i.e., complete and accurate statements) by allowing companies to file documents full of contradictions. *In re PLC Sys., Inc. Sec. Litig.*, 41 F. Supp. 2d at 115-16.

### C.    *The Peierls Sufficiently Pleaded that They Purchased Essential Stock at a Price Affected by Defendants' Misrepresentations and Omissions*

Defendants incorrectly argue that the Peierls failed to plead that the price at which they purchased Essential stock was affected by Defendants' misrepresentations. The Peierls satisfied this pleading requirement, specifically alleging that "[t]he price that Plaintiffs paid for Essential stock was affected by Essential's false or misleading statements." (Complaint ¶ 32.) Later in that same paragraph, the Peierls alleged precisely how the price was artificially inflated by Defendants' misrepresentations and nondisclosures.[4] (*Id.* (emphasis added).)

Misleading statements and omissions are incorporated into the price of stock traded on the open market, such as the Nasdaq. *Basic v. Levinson*, 485 U.S. 224, 241-42 (1988); *In re PLC Sys., Inc. Sec. Litig.*, 41 F. Supp. 2d at 116-17. Essential's first announcement of the potential delisting had an unmistakable negative effect on the stock price.[5] (Motion Ex. I.)

---

[4] Defendants' argument completely ignores these allegations. As shown above, they attempt to perpetuate the fiction that the price was not affected by incorrectly claiming that they never made any misrepresentations or omissions.

[5] The Ninth Circuit has rejected Defendants' argument that the delisting announcement was instantaneously transmitted into the market price. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003).

16

**D.    The Peierls' Claims Are Not Barred by the Statute of Limitations**

**1.    Sarbanes-Oxley Extended the Limitations Period for Section 18 Claims to Two Years from Discovery**

As part of the Sarbanes-Oxley Act of 2002, Congress amended the limitations period for certain claims under the federal securities laws. 15 U.S.C. § 1658 provides in relevant part:

> Notwithstanding subsection (a), a private right of action that involves a claim of *fraud, deceit, manipulation, or contrivance* in contravention of a regulatory requirement *concerning the securities laws*, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of-- (1) *2 years after the discovery of the facts constituting the violation*; or (2) 5 years after such violation.

*Id.* § 1658(b) (emphasis added). These extended limitations periods apply to Section 18 claims based on misleading statements. Michael A. Perino, *Enron's Legislative Aftermath: Some Reflections on the Deterrence Aspects of the Sarbanes-Oxley Act of 2002*, 76 St. John's L. Rev. 671, 693 (2002). *Stephenson v. Deutsche Bank A.C.*, 282 F. Supp. 2d 1032 (D. Minn. 2003), on which Defendants rely, does not apply because it did not address subsection (b) of § 1658, which was added by Sarbanes-Oxley.

Defendants assert that at the earliest, the July 25, 2002 press release put the Peierls on inquiry notice of Defendants' wrongdoing. Even if this were true, which is not the case, the Peierls filed their Complaint on November 12, 2003, well within two year limitation period.

**2.    The Peierls Claims Are Not Barred under Section 18(c)**

Even if a one-year statute of limitations applied rather than the two-year statute under Sarbanes-Oxley, dismissal would be improper because Defendants cannot establish that "the pleader's allegations leave no doubt that an asserted claim is time-barred." *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002).

Section 18(c) provides: "No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the

17

cause of action and within three years after such cause of action accrued." 15 U.S.C. § 78r(c). The Peierls filed their Complaint on November 12, 2003, within one year of discovering that the Defendants' statements were false and misleading based on Jeff Peierls' review of an Essential press release dated November 13, 2002. (Complaint at ¶ 28.) The Peierls further alleged that "[t]he November 13, 2002 press release was the first notice that Jeff Peierls or any of the other Plaintiffs had that the Series B preferred stock could not be counted toward shareholder equity for purpose of the Nasdaq listing requirements." (*Id.* at 30.) The Peierls also brought their claims within three years of their first purchase of Essential stock in reliance on Defendants' misrepresentations and omissions (i.e., on February 6, 2002).

Whether to allow Defendants to trigger the limitations period based on the August 14, 2002 Form 10-Q and the July 25, 2002 press release involves a two-prong analysis that is highly fact-intensive. *See Young*, 305 F.3d at 8. First, Defendants must show that the Peierls had inquiry notice of these documents. *See id.* A party is placed on inquiry notice if sufficient "storm warnings" of fraud are present. *Id.* Second, if inquiry notice is shown, the question turns to whether the Peierls exercised reasonable diligence to discover Defendants' wrongdoing. *See id.* For this analysis, the Peierls' causes of action accrued when, through exercise of reasonable diligence, they should have known of the Defendants' wrongdoing, *not when they were placed on inquiry notice. See id.* at 10. Resolving both issues involves questions of fact. *Id.* at 9.

Applying the first prong of the *Young* analysis, Defendants have failed to demonstrate that the Peierls were on inquiry notice of their fraud. Contrary to Defendants' assertions, the August 2002 Form 10-Q and the July 2002 press release could not have placed the Peierls on

inquiry notice.[6] Neither document stated that the Series B preferred stock was not "equity." A party is not placed on inquiry notice where documents contain such unclear and misleading statements. *Id.* at 11-12. Moreover, no case says that plaintiffs are on notice of everything in every SEC filing as soon as it is filed.

Even assuming that the Peierls were placed on inquiry notice by these two documents that they did not see, the Peierls have pleaded facts showing that they were reasonably diligent in keeping abreast of Essential's status. (Complaint ¶ 26.) The short timeframe (less than four months) between the date of July 2002 press release and Jeff Peierls' discovery of Defendants' fraud in the November 2002 press release was not an unreasonable amount of time in which to make this discovery. *See Young,* 305 F.3d at 10. The resolution of these issues at this stage of the proceedings, and in light of the allegations of the Complaint, would be premature.

### E.  *Defendants Aldrich and Walker Should Not Be Dismissed Because They Are Responsible for Statements in Essential's SEC Filings*

Defendants incorrectly assert that Defendants Aldrich and Walker cannot be responsible for statements in Essential's SEC filings, and therefore, the claims against them should be dismissed. Defendants are incorrect for two simple reasons. First, Section 18 liability flows to all directors and officers of a company, regardless of whether they signed the company's SEC filings that contained the false and misleading statements. *Kramer v. Scientific Control Corp.,* 452 F. Supp. 812, 817 (E.D. Pa. 1978).

---

[6] Defendants cite numerous cases purportedly establishing that the Peierls were on inquiry notice based on these two documents. (Motion at 15, 17.) These cases are distinguishable because they each involved far more than the two reports identified by Defendants here. The cases involved widespread information such as multiple pending lawsuits that related to the subject matter, extensive media coverage, or numerous public filings disclosing the problem. None of those cases involved specific allegations indicating that the plaintiffs exercised diligence.

Second, even if signing is a requirement to impose Section 18 liability, both Aldrich and Walker signed the Form 10-K dated March 29, 2002 that contained false and misleading statements and omissions. (Complaint ¶ 25.) The Form 10-K states as follows:

PURSUANT TO THE REQUIREMENTS OF THE SECURITIES EXCHANGE ACT OF 1934, THIS REPORT HAS BEEN SIGNED BY THE FOLLOWING PERSONS ON BEHALF OF THE REGISTRANT AND IN THE CAPACITIES AND ON THE DATES INDICATED.

(Motion Ex. D at 39.) Richard Aldrich and John P. Walker are listed under this heading as having signed in their capacity as directors on March 29, 2002.[7] This is sufficient to demonstrate that they signed the Form 10-K and thus are responsible for the statements made therein.

## IV. CONCLUSION

For the above stated reasons, this Court should deny Defendants' Motion.

Dated: March 9, 2004

Respectfully submitted,

By: _____

David E. Marder (BBO # 552485)
Robins, Kaplan, Miller & Ciresi L.L.P.
111 Huntington Avenue, Suite 1300
Boston, MA 02199
617-267-2300

Susan Bernhardt (Colo. Attorney Reg. # 20369)
Netzorg McKeever Koclanes & Bernhardt LLC
1670 Broadway, Suite 500
Denver, CO 80202
303-864-1000

---

[7] Aldrich's and Walker's actual signatures have not been indicated by the customary "/s/ [name]" above the line designated for them to sign.

# ROBINS, KAPLAN, MILLER & CIRESI LLP

SUITE 1300
111 HUNTINGTON AVENUE
BOSTON, MA 02199-7610
TEL: 617-267-2300  FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

DAVID E. MARDER

March 9, 2004

*VIA HAND DELIVERY*
Civil Clerk
United States District Court
District of Massachusetts
United States Courthouse
1 Courthouse Way - Suite 2300
Boston, MA 02210

Re:   *Peierls Foundation, Inc., et al. vs. James E. Rurka, et al.*
      US District Court, D. Mass. Civil Action No. 03-12213 EFH

Dear Sir/Madam:

Enclosed herewith for filing is *Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss*, along with a copy of the Memorandum, to be stamped and returned to the courier.

Thank you for your assistance, and please do not hesitate to call if you should have any questions concerning the enclosed.

Very truly yours,

ROBINS, KAPLAN, MILLER & CIRESI LLP

David E. Marder

Enclosures

cc:   Per Certificate of Service

35014066.1

ATLANTA · BOSTON · LOS ANGELES · MINNEAPOLIS · NAPLES · SAINT PAUL · WASHINGTON, D.C.