IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PEIERLS FOUNDATION, INC. and<br>E. JEFFREY PEIERLS, individually<br>and as trustee,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES E. RURKA, MARK SKALETSKY,<br>PAUL J. MELLETT, RICHARD ALDRICH,<br>KATE BINGHAM,<br>CHARLES W. NEWHALL III<br>DAVID SCHNELL, and JOHN P. WALKER,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 03 CV 12213 EFH |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Plaintiffs' opposition papers do not resuscitate their moribund claims. Essential's SEC filings disclose the very fact about which Plaintiffs claim they were misled: the outstanding Preferred Stock was not "stockholder's equity" for financial reporting purposes. Accordingly, Defendants' motion to dismiss should be granted.

### 1.   Essential's SEC Filings Were Neither False nor Misleading.

The financial statements in Essential's Form 10-K (and later SEC filings) put an end to Plaintiffs' case. Those financial statements exclude the outstanding Preferred Stock from reported stockholders' equity. This ends the case, because Plaintiffs do not dispute the fact that the Preferred Stock gave its holders an equity stake in Essential. Rather, they say they were

-2-

misled into believing that the outstanding Preferred Stock was "stockholders'
equity" for financial reporting (and therefore, Nasdaq listing) purposes. Opp.
at 7.

Essential's financial statements clearly informed a reader that the
outstanding Preferred Stock was not part of the reported stockholders' equity.
The relevant portion of the balance sheet states:

*    *    *

LIABILITIES AND STOCKHOLDERS' EQUITY

| | | | | |
|---|---|---:|---|---:|
| Current liabilities: | | | | |
|     Accounts payable | | $ 1,284 | $ | 566 |
|     Accrued compensation | | 2,210 | | 879 |
|     Current portion of notes payable | | 668 | | 1,597 |
|     Accrued merger and financing costs | | 700 | | ---- |
|     Deferred revenue | | 3,579 | | 7,323 |
|     Other accrued liabilities | | 1,196 | | 906 |
| Total current liabilities | | 9,637 | | 11,271 |
| Long-term portion of notes payable | | 456 | | 309 |
| Accrued rent | | 395 | | 294 |
| Series B convertible redeemable preferred stock, par value $0.001; 60,000 shares authorized at December 31, 2001; 60,000 shares issued and outstanding at December 31, 2001; aggregate liquidation redemption rights of $90,000 (net of deemed dividend and issuance costs) | | 51,775 | | ---- |
| Stockholders' equity: | | ---- | | ---- |
|     Preferred stock, par value $0.001; 5,000,000 shares authorized; 60,000 Series B shares issued and outstanding | | | | |
|     Common stock, par value $0.001; 50,000,000 shares authorized, 16,752,723 and 11,410,847 shares issued and outstanding at December 31, 2001 and 2000, respectively | | 17 | | 12 |
|     Additional paid-in capital | | 99,800 | | 68,471 |
|     Deferred compensation | | (2,692) | | ---- |
|     Notes receivable from stockholders | | (231) | | ---- |
|     Accumulated deficit | | (81,113) | | (53,188) |
|     Accumulated other comprehensive income | | ---- | | 29 |
|     Total stockholders' equity | | 15,781 | | 15,324 |
| | | $ 78,044 | $ | 27,198 |

Ex. D at F-3.

Nothing could be clearer: the outstanding Preferred Stock is reported
as being $51.775 million. The entry is on its own line, outside of stockholders'

-3-

equity. "Total stockholders' equity" is reported as $15.781 million. Plainly, stockholders' equity did not include the outstanding Preferred Stock.

These financial statements also report authorized but unissued preferred stock, as required, on a separate line item as part of stockholders' equity, but because the stock is unissued, it is not assigned any value. The unissued preferred stock, because it is <u>not</u> associated with any redemption rights, is properly to be reported under stockholders equity, as it was.[1]

But, say Plaintiffs, they purchased some stock <u>before</u> they read the Form 10-K. However, at the time the Form 10-K was issued, the price of Essential stock had increased since Plaintiffs' initial purchases. *See* Complaint Ex. A (reporting Plaintiffs' purchases at $3.23 or lower); Ex. I at 5 (reporting prices above $3.40 and $3.30 following the filing of the March 29, 2002 10-K). If Plaintiffs had been misled by earlier SEC filings, they no longer could be. They could have sold, at a profit, but did not. *See, e.g., Gerstle v. Gamble-Skogmo*, 478 F.2d 1281, 1306 n.7 (2d Cir. 1973) ("Once the seller has discovered the fraud, he can protect against further damage by

---

[1] In their Opposition, but not in the Complaint, Plaintiffs contend that the notes to the financial statements headed " Stockholders' Equity" is misleading and does not comply with SEC rules. Again, they are flat wrong. Note 8, about which Plaintiffs now complain, explains that Essential has authorized 5 million shares of preferred stock and references to a separate Note 7 ("Series B Redeemable Convertible Preferred Stock") with respect to the portion of those shares that have been authorized – <u>with redemption rights</u> – and are not part of stockholders' equity. The balance of the preferred shares are not issued, are <u>not</u> associated with redemption rights, and are stockholders' equity under Reg. S-X, 17 CFR § 210.5-02(29) (though being unissued they are not assigned a value). Thus, the notes directly parallel the presentation in the balance sheet: (1) authorized and unissued preferred stock – <u>without redemption rights</u> – is explained under "stockholders' equity" and (2) the portion of the preferred stock that has been issued – with redemption rights – is explained in a separate note. This corresponds to the SEC regulations and clearly segregates the outstanding Preferred Stock, since it is redeemable.

-5-

32), Plaintiffs ignore the case law stating that a company is not required to explain the implications of its financial statements or capital structure to exchange listing requirements. *See* Memorandum in Support of Motion to Dismiss ("Memorandum"), at 10.[2] Instead, they fall back to saying, again, that they were misled about whether the outstanding Preferred Stock was stockholders' equity. This is the same, incorrect, point restated. It is still wrong: the Form 10-K made accurate disclosure that the Preferred Stock was not stockholders' equity for financial reporting purposes.[3]    No more was required.

## Cash Needs

Searching for a way out of the safe harbor for forward-looking statements regarding Essential's "future capital requirements," Plaintiffs assert that Essential misrepresented that the $60 million in funding was part of its "existing capital resources." Opp. at 13. Plaintiffs fail to plead facts that explain why this was statement was incorrect. *See* Section 21D(b)(1) of the Exchange Act ("[T]he complaint shall specify . . . the reason or reasons why the statement is misleading."). If Plaintiffs are suggesting that the

---

[2] Plaintiffs do argue that the *K-Tel* opinion, 107 F.Supp. at 1005, is incorrectly cited. Opp. at 12, n. 1. *K-Tel*, however, concluded that the plaintiffs had not pled *scienter* where, as here, the company's capital position but did not state whether it was in compliance with Nasdaq listing maintenance standards, despite having received a Nasdaq delisting letter. *Id.* If the Court had viewed the company's disclosure as misleading – as Plaintiffs contend here – it could hardly have found that the company's "failure to immediately publicize the [delisting] letter does not create a strong inference of fraudulent intent." *Id.*

[3] Plaintiffs say that Essential should have disclosed both that the outstanding Preferred Stock was equity and that it was not included in stockholders' equity. It did. Plaintiffs did not pay attention.

-6-

redemption provisions pertaining to the outstanding Preferred Stock meant that the funding it provided was not an "existing capital resource," they are plainly wrong. These funds were available, as reflected on the face of the audited financial statements. Ex. D, at F-3.

The fact that the outstanding Preferred Stock was redeemable was repeatedly disclosed in the Form 10-K and in other filings allegedly read by Plaintiffs. Opening Brief at 9. Thus, Plaintiffs knew that under the specified circumstances, holders of the outstanding Preferred Stock could elect to redeem, an action that would diminish Essential's capital resources. Moreover, since Plaintiffs were on notice of the redemption terms of the outstanding Preferred Stock, they could assess for themselves any implications under publicly available listing standards.[4] Plaintiffs and Essential did not make any false or misleading statements regarding the "availability" of the capital from the Preferred Stock.

### 2. Plaintiffs Did Not Reasonably Rely on Any Alleged Misstatement.

On the face of the Complaint and referenced filings, Plaintiffs alleged reliance was not reasonable. Even under their own reading of the Form 10-K, the financial statements were at odds with what Plaintiffs claim they understood. If earlier filings actually had led them to believe that the approximately $60 million of outstanding Preferred Stock was stockholders'

---

[4] Plaintiffs' last-ditch attempt to find a misleading statement focuses on a statement in October 2001 that the new company formed by the merger "will continue to trade on the Nasdaq National Market under the *new symbol* ETRX" *see* Ex. B (press release) (emphasis added). On its face, this was not a guarantee that Essential would always continue to trade there but an accurate statement of the exchange on which the new common stock was to be listed. Essential traded on Nasdaq under the new symbol ETRX for eighteen months following this statement. Complaint, ¶ 29.

-7-

equity for purposes of financial reporting (or Nasdaq listing requirements), the Form 10-K which they allegedly read at least had to cause them to question why stockholders' equity was reported as only $15.7 million. Plaintiffs could not be confused or uncertain and reasonably rely. *See, e.g., Foremost Guar. Corp. v. Meritor Sav. Bank* 910 F.2d 118, 125 (4th Cir. 1990) ("we do not think the plaintiff could reasonably have relied upon the allegedly fraudulent statements made in the face of plainly contradictory contractual language"); *Brown v. E.F. Hutton Group*, 991 F.2d 1020, 1033 (2d Cir. 1993) (holding that reliance was unjustifiable as a matter of law where the company's "offering materials . . . contradicted the brokers' alleged general assurances").

As before, there is no factual dispute. The Court not only may, but should, decide that question as a matter of law, because it is not one on which reasonable people could disagree. *See Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F.Supp.2d 275, 290 (S.D.N.Y. 1998) ("whether a plaintiff has adequately pleaded justifiable reliance is a proper subject for a motion to dismiss").

### 3. **Plaintiffs' Claim is Barred by the Statute of Limitations.**

Plaintiffs ask the Court to read 15 U.S.C. § 1658 as amending Section 18 of the Exchange Act to provide a limitations period of two years from discovery. They cite no judicial authority. None exists.

Courts have consistently held that Section 1658 does not alter the statutes of limitations set forth in the express rights of action under the securities laws. *See, e.g., Stephenson*, 282 F.Supp.2d at 1067 (refusing to

-8-

apply Section 1658 to claim under Section 9 of the Exchange Act); *In re Worldcom, Inc. Sec. Litig.*, 294 F.Supp. 431, 442 (S.D.N.Y. 2003) (holding that Section 1658 does not apply to claims under Sections 11 and 12 of the Securities Act); *In re Global Crossing*, 2003 WL 22999478, * 3 (S.D.N.Y. Dec. 22, 2003) ("by its plain text, the amendment [in subsection (b) of Section 1658] does not apply to claims under Sections 11 and 14].

The plain words of the statute compel the same result here. A claim under Section 18 of the Exchange Act does not involve "a claim of fraud, deceit, manipulation, or contrivance" and is not based on the "contravention of a regulatory requirement." The limitations period for such a claim is unaffected by Section 1658.

Plaintiffs next argue that the limitations period did not begin to run until November 13, 2002, despite Essential's earlier statements that it had negative stockholder' equity and that "our common stock may be delisted." Ex. F, at 3; Ex. H at 4, 15. They say they did not see these documents (Opp. at 19) and the limitations period should not be held to have started to run until nearly four months later, when they read a later SEC filing.[5]

However, courts repeatedly have held that public filings and announcements trigger the commencement of the limitations period. *See, e.g., LC Capital Partners, LP v. Frontier Insurance Group*, 318 F.3d 148 (2d Cir. 2003) ("storm warnings" evident in publicly available documents when

---

[5] In asserting now that they did not review the July 25, 2002 press release, Opp. at 19, Plaintiffs are claiming that after March 2002 there was a five-month hiatus during which they read none of Essential's press releases. They are also claiming that after March 2002 they stopped reading Essential's SEC filings altogether, even when they decided to purchase more Essential stock in October 2002 at a sharply lower share price

-9-

three substantial reserve charges were taken and national underwriting article published discussing reserve problems) and cases cited in Opening Brief at 15.  Here, moreover, Plaintiffs had substantial reason to continue to follow the Company's public statements, as they alleged they had done prior to June.   By June, 2002, when Essential reported negative stockholders' equity, Plaintiffs' owned 288,000 shares of Essential stock purchased for approximately $870,000.  Complaint Ex. A.

Plaintiffs had further reason to inquire and read Essential's statements: between March 2002, when they say they last read an Essential filing and mid-October 2002, the price of Essential stock fell from approximately $3.49 to 84¢ – a decline of over 75%.  Ex. I. *See, e.g., Reisman v. KPMG Peat Marwick LLP*, 965 F.Supp. 165, 171 (D. Mass. 1997) ("Certainly, as Marcam's share price dropped between June and November, 1993, storm clouds must have gathered on the horizon...."); *Abelson v. Strong*, 644 F.Supp. 524, 532 (D. Mass. 1986) ("In this case, plaintiffs were placed on inquiry notice by the sharp drop in the price of AZL stock.").    Plaintiffs admittedly knew this fact, because they purchased 30,900 shares of Essential common stock in October 2002.  Complaint ¶ 27.

The fact that there were not "multiple lawsuits," Opp. at 19, n. 6, is a red herring.  Plaintiffs had reason to attend to storm warnings and read the Form 10-Q and July 25 press release but admit that they did not. Plaintiffs did not act with diligence and are barred by the one-year statute of limitations set forth in Section 18.  *See Fuqua v. Ernst & Young, LLP*, 2001-2002 Fed. Sec. L. Rep. (CCH), para 91,768 (2d Cir. 2002) (granting motion to dismiss where "the facts needed in determination of when a reasonable

-10-

investor of ordinary intelligence would have been aware of fraud can be gleaned from the complaint and papers such as the prospectus and disclosure forms that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate")(citation omitted).

### 4. Plaintiffs' Assertion that the Alleged Misrepresentation Affected the Price of Essential Stock Fails as a Matter of Law.

Plaintiffs do not dispute that they must show that the alleged misrepresentation negatively affected the price of Essential stock. As Judge Pollack recently held in *In re Merrill Lynch Tyco Research Sec. Litig.*, 03-CV-4080, 2004 WL 305809 (February 18, 2004 S.D.N.Y.), plaintiffs must do more than make "conclusory allegations" – they must "allege facts showing that the misrepresentations and omissions alleged in the complaint were the proximate cause" of the decline in stock price. *Id.* at 1, 2.

Plaintiffs acknowledge that the price of Essential stock incorporated the information contained in Essential's filings. Opp. at 16. It is undisputed that after Essential filed its Form 10-Q on August 14, 2002 stating that it had insufficient stockholders' equity under Nasdaq listing requirements, and that delisting was possible, the price of Essential <u>increased</u>. (Contrary to the Complaint, Opp. at 16, the August 14, 2002 Form 10-Q was indisputably the "first announcement of the potential delisting.") This is because the Company's stockholders' equity had been reported accurately all along and Nasdaq listing rules are publicly available. Express and unequivocal disclosure of the very risk that Plaintiffs claim was concealed did not cause a decline in the price of Essential's common stock. *See Merrill Lynch* at 2

-11-

(plaintiffs could not show loss causation where the "shares actually closed higher" after disclosure of allegedly concealed information).[6]

Plaintiffs cite *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003) and argue that the delisting announcement was not "instantaneously" reflected in Essential's share price. Opp. at 16 n. 5. In the *Pension Trust Fund* case, however, the plaintiffs alleged facts explaining why there was a "delay" in market reaction. *See id.* ("Plaintiffs offer a reason for the delay, *i.e.*, America West continued to reassure analysts that [the disclosed facts] would not have noticeable economic affects on the company.") Plaintiffs fail to do so here. Furthermore, Essential's share price <u>increased</u> by over 50% following the filing of the Form 10-Q..

---

[6] Plaintiffs argue that Defendants Walker and Aldrich signed the Form 10-K even though the signature page shows that they did not because there is no "/s/" notation next to their names. Opp. at 20 & n. 7. That notation is universally recognized as indicating whether there is a signature on the original document.

-12-

## CONCLUSION

The Complaint must be dismissed.

Respectfully submitted,

**JAMES RURKA,
MARK   SKALETSKY,   PAUL   J.
MELLETT, RICHARD ALDRICH,
KATE BINGHAM, CHARLES W.
NEWHALL III, DAVID SCHNELL,
AND JOHN P. WALKER,**

By their attorneys,

_____
Steven W. Hansen (BBO# 220820)
Matthew C. Applebaum (BBO#
653606)
**Bingham McCutchen LLP**
150 Federal Street
Boston, MA 02110
(617) 951-8000

Dated:       March 16, 2004.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was served upon counsel for Plaintiffs, David E. Marder, Robins, Kaplan, Miller & Ciresi, L.L.P., 111 Huntington Ave., Boston MA 02199, by hand on March 16, 2004.

_____
Steven W. Hansen